**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION**

SHAWN JUNKER,               )
                                       )
      Plaintiff,           )        Case No. 1:14-cv-00074
                                       )        Senior Judge Haynes
v.                         )
                                       )
CAROLYN W. COLVIN,       )
Acting Commissioner of Social Security,   )
                                       )
      Defendant.       )

## M E M O R A N D U M

Plaintiff, Shawn Junker, filed this action under 42 U.S.C. § 405(g) against the Defendant Carolyn Colvin, Acting Commissioner of Social Security, seeking judicial review of the Commissioner's denial of his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act.

Before the Court is Plaintiff's motion for judgment on the record (Docket Entry No. 25) contending, in sum, that the Administrative Law Judge ("ALJ") erred (1) by failing to consider properly Plaintiff's subjective complaints; (2) by crediting the vocational expert's testimony; and (3) by inaccurately weighing the opinions of treating and consulting physicians. The Commissioner contends that the ALJ's decision is supported by substantial evidence.

After the evidentiary hearing, the ALJ evaluated Plaintiff's claim for SSI using the sequential evaluation process set forth at 20 C.F.R. § 416.920. (Docket Entry No. 15, Administrative Record at 20).[1]

First, the ALJ concluded that Plaintiff met the insured status requirements of the Social

---

[1]The Court's citations are to the pagination in the Administrative Record, not in the electronic case filing system.

Security Act through June 30, 1991. Id. at 21.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 30, 1989, the alleged onset date. Id.

At step two, the ALJ determined that Plaintiff has the following severe impairments: Buerger's disease; depressive disorder; and panic disorder with agoraphobia. Id.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. at 22.

At step four, the ALJ determined that Plaintiff had the residual functional capacity to perform less than the full range of sedentary work with the following limitations: Plaintiff can lift and carry a maximum of 10 pounds; can stand and walk for less than 2 hours in an 8-hour workday; can sit with no restrictions in an 8-hour workday; can understand and remember simple and multistep instructions; can attend to such instructions for periods of at least 2 hours in an 8-hour workday with appropriate breaks; is not capable of routine interactions with the general public while still exercising appropriate social interactions with supervisors and coworkers; and is capable of adapting to infrequent changes in the workplace. Id. at 24-25.

At step five, the ALJ found that Plaintiff has no past relevant work, but that jobs exist in significant numbers in the national economy that Plaintiff can perform. Id. at 28. The ALJ concluded that Plaintiff was not disabled within the meaning of the Act and was not entitled to benefits. Id. at 28. Plaintiff requested a review of the ALJ's decision. Id. at 7-15. On January 30, 2014, the Appeals Council denied Plaintiff's request for review. Id. at 1-6.

## A. Review of the Record

Plaintiff applied for Disability Insurance Benefits (DIB) and Social Security Insurance (SSI) on July 27, 2010. (Docket Entry No. 15, Administrative Record, at 19). Plaintiff's alleged onset date of disability is November 30, 1989. Id. at 137.

Plaintiff submitted medical records predating the alleged onset date of disability. Id. 380-85. On February 14, 1989, Plaintiff visited Mercy Hospital "with suspicion of Buerger's disease." Id. at 381. Plaintiff's orthopedic surgeon "suggested he had Buerger's disease with a 90% chance that this would result in a below-the-knee amputation." Id. Plaintiff underwent an arteriogram that showed "very extensive occlusive disease throughout the left lower extremity from the origin of the left [superficial femoral artery] to the foot predominat[e]ly small collateral circulation was found below the knee." Id. After the arteriogram, it was noted that "[o]cclusive disease secondary to trauma and thrombosis is thus probably more likely than Burger's[2] disease, although the latter cannot be excluded." Id. at 385.

Because Buerger's disease is worsened by smoking, Dr. Brimmer wrote that he:

> Felt that he did not have a surgically reconstructable situation, so the patient has been strongly encouraged to stop smoking. (Of note was the fact that both he and his parents told me that the surgeons in Galesburg also encouraged him to stop smoking, however he currently declined prior to coming here). He states now that he will try to quit smoking. Also told him that second-hand smoking in his household may also be harmful to him.

Id. at 381. Dr. Brimmer concluded, "I feel he will require an amputation at some point." Id.

The report dated the night before Plaintiff's arteriogram reflects that "[o]ver the last three years, [Plaintiff's left foot] has been entirely stable ... He has had no problems with it." Id. at 382.

---

[2]Buerger's disease is often misspelled in Plaintiff's medical records. The Court will retain the spelling used by each physician.

Plaintiff was prescribed Trental, and reported that the "color [in Plaintiff's left foot] has been not as bad and he is feeling a little bit better because of it." Id. Plaintiff appeared to be "a young male in no acute discomfort." Id.

On June 17, 2002, Plaintiff visited Galesburg Cottage Hospital and underwent an arterial imaging of his lower extremities. Id. at 233-34. The imaging showed "occlusion the superficial femoral, popliteal and posterior tibial arteries bilaterally with numerous collateral vessels visualized bilaterally." Id. Imaging also "demonstrate[d] evidence for atherosclerotic disease" and "[t]he great toe systolic pressures suggest[ed] that blood flow is adequate to prevent severe ischemia at the digit level bilaterally." Id.

On July 10, 2002, Plaintiff visited Dr. Mark Davis, who observed that Plaintiff "continues to smoke despite many admonitions to the contrary with Berger's disease diagnosed at the age of 18." Id. at 232. Plaintiff also "gets claudication but works through it and actually does not stop his progress, although he does live with some pain." Id. Dr. Davis concluded:

> I think for now we're going to watch this. He clearly has severe [peripheral vascular disease] but at his age and his underlying disease state, and his continued smoking I think he has only one shot at potential bypass in the future and to that end I am very hesitant in doing anything now in that he is able [to] live his life as he wants to and his limbs are not threatened. Certainly if any of those things change then a more aggressive approach will be mandated but I've told him he is going to have to quit smoking. He seems comfortable with this approach and we'll be seeing him again in six months for further evaluation.

Id.

Plaintiff's next medical record is dated June 24, 2005 and reflects Plaintiff's visit to Galesburg Internal Medicine for a check up that found "[n]o new problems." Id. at 372.

On August 2, 2005, Plaintiff visited Galesburg Cottage Hospital. Id. at 260-61; 329-50.

Plaintiff "complain[ed] of midsternal chest pain and shortness of breath which started 2 hours ago. He is a chronic smoker." Id. at 260. Plaintiff underwent a "computed tomography of the chest, after contrast enhancement" that showed "no evidence of pulmonary embolism." Id. Plaintiff was "able to ambulate independently, and can perform all activities of daily living without assistance." Id. at 335. Plaintiff "denie[d] numbness or tingling." Id. Plaintiff had complained of chest pain, but now denied experiencing chest pain. Id.

On August 8, 2005, Plaintiff visited Dr. Joseph Maslak for a followup regarding his hospital visit on August 2, 2005. Id. at 371. Plaintiff was "trying to quit smoking. He is down to 7 cigarettes per day." Id. Plaintiff was noted as experiencing "Burgers disease" and "[t]obacco habituation, for which smoking cessation is again reiterated." Id.

On August 10, 2005, Plaintiff visited Galesburg Cottage Hospital for a pulmonary function test. Id. at 327. The results were "normal," including normal spirometry, maximal voluntary ventilation, flow volume loop, lung volumes and diffusing capacity of the lungs for carbon monoxide. Id.

On August 24, 2005, Plaintiff visited Galesburg Internal Medicine with "swollen glands." Id. at 369-70. Plaintiff experienced "shortness of breath" on a vacation earlier that month, and "knows he occasionally has to take a deep breath. He said he cannot get enough air in, but this may be due to his weight also." Id. at 370. Otherwise, he "feels pretty good at the present time." Id. Dr. Carl Strauch concluded that "I think the patient is doing okay. He needs to get his weight down which may also help some with his breathing. He is off cigarettes now." Id.

On November 3, 2005, Plaintiff visited Galesburg Cottage Hospital. Id. at 257-58; 351. Plaintiff stated he was an "exsmoker" and had "[n]o current chest complaints." Id. at 257. Plaintiff

underwent a radiology procedure taking two views of his chest that showed "no active cardiopulmonary disease." Id.

On March 6, 2006, Plaintiff visited Galesburg Internal Medicine with complaints of "sensation of heart 'skipping beats [and] beating fast' – duration 'a split second'" but he "[d]enie[d] any pain." Id. at 367-68. Dr. Strauch considered Plaintiff's complaints to "sound[] like palpitations and anxiety attacks." Id. at 368. Plaintiff reported that "[h]e quit smoking 7 months ago." Id. Dr. Strauch "tried to reassure [Plaintiff] that this is probably nothing to worry about." Id.    On March 8, 2006, Plaintiff was admitted to Galesburg Cottage Hospital with "palpitations / Holter monitor." Id. at 239-55. Plaintiff "complained of his heart skipping at times," so he was "monitored for 20 hours and 6 minutes." Id. at 240. After observation, Dr. Strauch concluded that the "Holter monitor [showed] the patient having 1 short episode of ventricular tachychardia, rare PAC. Based on this no therapy is indicated. I will discuss with the patient. He may need an event monitor if his symptoms do persist." Id.

On August 22, 2006, Plaintiff visited Galesburg Internal Medicine with "'terrible panic attacks' [for the] past 2 [weeks]." Id. at 365-66. Dr. Strauch observed:

> The patient comes in with notes for the past several days of how he has been feeling. He has been having some panic attacks and palpitations. Earlier this year he had a Holter monitor done and it was entirely normal. He thinks his heart is quivering at times and will start jumping. He feels like it is going to come out of his chest. He is very very anxious he states. He cannot sleep at night. I reviewed the notes with him. We had a long talk about things. ... He still is staying off cigarettes also.

Id. at 366.

On September 1, 2006, Plaintiff visited Galesburg Cottage Hospital and "presented with chest pressure and premature beats at rest" and stated he was an "[e]x-smoker." Id. at 256. A

"rest/exercise stress myocardial perfusion scintiscans/wall motion study/left ventricular ejection fraction analysis" was conducted that showed "small focus of partly reversible perfusion defect in the inferior wall close to the base in the distribution of the right coronary artery. Otherwise normal study." Id.

On September 3, 2006, Plaintiff underwent another stress test. Id. at 303-26. Plaintiff was noted to have "a history of peripheral vascular disease and tobacco abuse in the past," but Plaintiff stated that he "quit smoking about a year ago." Id. at 303. It was noted that Plaintiff had "above average fitness." Id. Based on the test, "no ischemia [wa]s seen." Id.

On September 12, 2006, Plaintiff visited Galesburg Internal Medicine for a check up and laboratory results. Id. at 362-63. Plaintiff had "[n]o new problems." Id. at 362. Plaintiff was "doing fair today" and stated that "he was feeling better, as far as panic, until the stress test report was called and this was understandable." Id. at 363. Plaintiff reported that he was "staying off cigarettes still." Id.

On September 18, 2006, Plaintiff visited Galesburg Cottage Hospital for a stress echocardiogram. Id. at 262-97. Plaintiff presented with a "previous history of smoking" and "atypical chest pain." Id. at 262. The stress test showed "[n]ormal electrocardiographic report of the stress test," "[n]ormal electrocardiographic portion of the stress echocardiogram with no evidence of ischemic induced regional wall motion abnormalities," "[g]ood function capacity for age" and "[n]o malignant arrythmias observed with exercise." Id. at 263. An addendum reflects that Plaintiff "also has some anxiety problems." Id.

On November 28, 2006, Plaintiff visited Galesburg Internal Medicine for a check up and laboratory results. Id. at 360-61. Plaintiff was "doing pretty well today" and "has had no new

problems." Id. at 361. Plaintiff reported that he was "staying off cigarettes and really feels quite good at the present time." Id.

On April 10, 2007, Plaintiff visited Galesburg Internal Medicine for a four-month check up. Id. at 358-59. Plaintiff had "[no] [complaints] [at] this time." Id. at 358. Plaintiff was "doing pretty well today." Id. at 359. Dr. Strauch noted that Plaintiff "has gained about 9 pounds since I last saw him," but "has stayed off cigarettes however." Id. Plainitff's "legs [were] doing fine" and "[a]ll in all he really feels pretty good at the present time." Id.

On December 11, 2009, Plaintiff visited Quality MedPro for an "all systems examination." Id. at 425-30. Plaintiff described his Buerger's disease:

> Mr. Junker stated he was given the diagnosis of Buerger's disease in 1988, which restricted blood flow to his legs. He was told it could affect his arms and it could cause gangrene, arterial bypass, or amputation in the future. Surgery had not been recommended at this time. He complained of pain, numbness, and tingling in both lower legs (left greater than right) with weightbearing more than 15 minutes or so. He would develop sores on his legs and feet that were slow to heal. He stated walking helped with the blood flow but caused worsening pain. He was placed on medication and told to avoid the heat and cold, and he had difficulty with walking, standing, and squatting. He felt these symptoms had a major affect on his ability to perform general tasks and work duties.

Id. at 425.

At this point, Plaintiff "admitted to smoking three-fourths pack of cigarettes per day for three years." Id. at 426. A medical assessment revealed that Plaintiff's abilities were limited to "[o]ccasionally lift and/or carry (including upward pulling) for up to 1/3 of an 8-hour workday with no restrictions," "[f]requently lift and/or carry 1/3 to 2/3rds of an 8-hour workday a maximum of less than 10 pounds because of PVD," "[s]tand and/or walk (with normal breaks) for a total of less than 2 hours in an 8-hour workday because of PVD," and "[s]it (with normal breaks) with no restrictions."

Id. at 430.

On December 15, 2009, Plaintiff underwent a psychological evaluation. Id. at 432-37. Plaintiff's medical problems were listed as "Buerger's Disease, high cholesterol, high blood pressure, triglycerides." Id. at 432. Plaintiff described his panic attacks:

> Mr. Junker reports that he has had problems with panic attacks for seventeen to eighteen years. Daily, before taking medications, he experienced these symptoms. Currently, he stated that these attacks only occur when meeting new people or in a new situation. Symptoms of an attack include "heart races, sick to my stomach, want to crawl up in a ball somewhere, sweat." He stated that he has not been in a store alone for seventeen to eighteen years.

Id. at 433.

During the interview, Plaintiff described his limitations as an inability to go to the store and feeling uncomfortable around people he did not know. Id. at 434. Plaintiff could clean the house; do "scroll saw work;" watch television eight hours a day; read; make "name plates;" and do yard work, laundry, and housekeeping. Id. Melissa Greer, M.S., an evaluator, noted that Plaintiff "did not appear overly anxious and there were no indications of panic attacks during the interview." Id. at 435. Greer determined that Plaintiff had a mild limitation in his ability to understand and remember, due to anxiety; a moderate limitation in his ability to sustain concentration and persistence, due to panic attacks; a moderate to severe limitation in social interaction, due to panic attacks; and a moderate limitation in adaptation, due to panic attacks. Id. at 436.

On March 19, 2010, Plaintiff visited Lifespan Health for a medication refill and complained of musculoskeletal pain. Id. at 440-43. At the time, Plaintiff was a "current tobacco user." Id. at 440. It was noted that Plaintiff was "not anxious[.]" Id. at 442.

On July 27, 2010, Plaintiff applied for Social Security benefits. Id. at 137.

9

On October 4, 2010, Plaintiff completed a function report describing his ability to work as limited:

> Can not stand for more than 20-30 min[utes] without pain. Cannot stub toes or drop anything on them. Cannot allow extreme heat or cold near them. Knee goes out if twisted wrong [and] then am down for several days. Social anxiety does not allow me to meet new people or end up in a social situation without a panic attack. Recently diagnosed with Diabetes which Doc[tor] says now increase chances of loosing (sic) Limb. Told to be doubly careful with feet[.]

Id. at 186-93.

Plaintiff stated that he could do "laundry, dishes, take out garbage, mow (rider)[,] mow (pushmower)[.]" Id. at 188. Plaintiff also stated that he went outside "1 or 2 times a day." Id. at 189. Plaintiff reported that he did not socialize, but he did "get along with [his] wife [and] kids." Id. at 191. Plaintiff stated that he was limited in lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, and getting along with others. Id. As the reason for his limitations, Plaintiff wrote that he "can only do [the physical tasks] for short times without resting" and that he does not get along with others because he "simply avoid[s] such situations when at all possible." Id. Plaintiff stated that he could walk for "20-30 min" but had to stop and rest for "1-2 hrs." Id. Plaintiff did not report taking any medications. Id. at 193.

On October 13, 2010, Dr. Darrel Ray Rinehart evaluated Plaintiff. Id. at 494-98. According to Dr. Rinehart, Plaintiff gave "a history of Buerger's disease for the past 20 years. He states it affects his lower extremities particularly below the knees bilaterally. His understanding is that his 'veins' are closed below the knees. ... He states if he stands or walks on his legs for more than 15 minutes the feet, in particular, will go numb. When he sits and keeps his legs elevated, he does well. He was told to be careful with lifting that he could drop objects on his feet which could result in

infection." Id. at 494. At the time, Plaintiff reported being a smoker. Id. Regarding Buerger's disease, Dr. Rinehart observed, "[Plaintiff] was diagnosed 20 years ago which is a vascular disease currently being treated with nifedipine. He states with any type of exertional activity or if he is on his feet for any length of time, his feet go numb." Id. at 496. Plaintiff's "exam was remarkable only for [Dr. Rinehart's] not being able to appreciate pulses in [Plaintiff's] feet and ankles. Otherwise his exam was normal." Id. Dr. Rinehart concluded, "[a]t this particular time, it is [Dr. Rinehart's] feeling based on exam and observation at this time that he has no impairment related physical limitations." Id. at 497.

On November 9, 2010, Plaintiff underwent a psychological evaluation by Disability Determination Services. Id. at 500-07. At the time, Plaintiff reported smoking "about 1 pack of cigarettes per day." Id. at 501. Plaintiff "state[d] that he has been depressed and irritable. He state[d] that he tends to stay in his room if he cannot afford his medication. He note[d] that when he is on his medication, he can interact with his family but still does not interact with others. He note[d] that he does not go out into public because he feels uncomfortable around people." Id. at 502. Plaintiff also stated that he experienced "depression, irritability, and social anxiety" as well as "panic attacks." Id. Plaintiff reported that he could prepare simple meals, wash dishes, vacuum, sweep, do laundry, read, watch movies, and fish. Id. at 503. Plaintiff "state[d] that he can only stand for 15 to 20 minutes at a time because of his blood circulation difficulties," and could not go to the grocery store "because he does not go out in public. Id. LaShonda Hughes, a psychologist, concluded:

> [Plaintiff's] psychiatric state during the interview appeared anxious. He shows evidence of a moderate to marked impairment in his social relating. He states that he does not have friends and avoids people. He states that people make him

extremely nervous. He appears to be mildly to moderately impaired in his ability to adapt to change. He uses avoidance and has to prepare himself mentally for any social interaction.

Id.

Dr. Hughes also completed a medical source statement of Plaintiff's ability to do work-related activities. Id. at 505-07. Dr. Hughes checked both "mild" and "moderate" limitations for Plaintiff's ability to carry out complex instructions, and also determined that Plaintiff was moderately limited in his ability to make judgments on complex work-related decisions. Id. at 505. Dr. Hughes concluded, "[b]ased on the claimant's self report and presentation, he does not appear to have problems with comprehension. However, he shows moderate impairment in his ability to sustain concentration and his anxiety level will likely affect his decision making." Id. Dr. Hughes assessed a mild limitation in Plaintiff's ability to interact appropriately with supervisors, and a moderate limitation in his ability to interact appropriately with co-workers and his ability to respond appropriately to usual work situations and to changes in a routine work setting. Id. at 506. Dr. Hughes concluded, "[b]ased on the claimant's self report, he has extreme difficulty going out in public. He appears to have difficulty communicating with others, but will likely do well in solo performance jobs like the dishwasher jobs he had 20 years ago." Id.

On December 1, 2010, P. Jeffrey Wright Ph.D. completed a "psychiatric review technique" for Plaintiff. Id. at 508-21. Dr. Wright conducted the assessment from November 30, 1989 to June 30, 1991 "and current." Id. at 508. Dr. Wright based his assessment on Plaintiff's "affective disorders," specifically "depression [not otherwise specified]; "anxiety-related disorders," specifically "pani[c] [disorder] with agoraphobia vs social phobia;" and "substance addiction disorders," specifically "[history] of cannabis abuse." Id. at 508, 511, 513, 516. Dr. Wright

12

determined that Plaintiff had a moderate limitation in activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. Id. at 518. Dr. Wright concluded that "claimant's allegations [were] credible as the [medically determinable impairments] could reasonably produce the stated symptoms and moderate functional limitations as opined by panelist given great weight. Capable. See [mental RFC]." Id. at 520. Regarding Plaintiff's DIB, Dr. Wright concluded, "there is insufficient evidence in file to evaluate claimant's a[l]legations and functional limitations [alleged onset date] to [date last insured]." Id.

Dr. Wright also completed a mental RFC. Id. at 522-25. Dr. Wright determined that Plaintiff was moderately limited in his ability to "maintain attention and concentration for extended periods," "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, "work in coordination with or proximity to others without being distracted by them," "to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, "to accept instructions and respond appropriately to criticism from supervisors," "to get along with coworkers or peers without distracting them or exhibiting behavioral extremes," and "to respond appropriately to changes in the work setting." Id. at 522-23. Plaintiff had a marked limitation, in his "ability to interact appropriately with the general public." Id. at 523. Dr. Wright concluded:

> A: Claimant is capable of understanding and remembering simple and [m]ultistep instruction.
> B: Claimant is capable of attending to simple and multistep tasks for periods of at least two hours in an eight hour workday with appropriate break periods resulting in a completed [r]outine workweek.
> C: Claimant is not capable of routine interactions with the general public but can exercise appropriate social interactions with peers/authority figures within the

restrictions as noted above.
D: Claimant is capable of adapting to infrequent routine changes in the workplace within the restrictions as noted above.

Id. at 524.

On December 16, 2010, Plaintiff underwent bilateral ankle-brachial measurements. Id. at 527. The test showed "[m]ild to moderate bilateral lower extremity arterial insufficiency based on ankle-brachial indices alone." Id.

On January 28, 2011, examiner G. Ayers of the Tennessee Department of Rehabilitation Services completed a vocational analysis. Id. at 194-97. Ayers limited Plaintiff to lifting twenty pounds maximum and ten pounds frequently, to standing/walking for two hours a day and sitting for six hours a day, and to pushing/pulling occasionally, with restrictions on the right and left legs. Id. at 194. Ayers also limited Plaintiff to occasionally climbing ramps/stairs, balancing, stooping, kneeling, crouching and crawling, and to never climbing ladders/ropes/scaffolds. Id. Ayers also assigned mental restrictions. Id. Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to work in coordination with or proximity to others without being distracted by them; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to accept instructions and respond appropriately to criticism from supervisors; ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and the ability to respond appropriately to changes in the work setting; Plaintiff was also markedly limited in the ability to interact appropriately with the general public. Id. Ayers concluded that Plaintiff was able to adjust to work,

although Plaintiff had no past relevant work. Id. at 195-96.

On January 31, 2011, Dr. James Moore conducted a physical RFC. Id. at 530-39. Dr. Moore noted Plaintiff's last insured date as June 30, 1991 and listed Plaintiff's diagnoses as Buerger's disease, hypertension, high cholesterol, diabetes mellitus, and obesity. Id. at 530. Dr. Moore limited Plaintiff to lifting and/or carrying twenty pounds occasionally and ten pounds frequently; standing and/or walking at least two hours in an eight-hour workday and sitting about six hours in an eight-hour workday; and pushing and/or pulling that was limited in lower extremities. Id. at 531. Plaintiff was limited to occasionally climbing ramps/stairs, balancing, stooping, kneeling, crouching and crawling; and to never climbing ladders/ropes/scaffolds. Id. at 532.

Dr. Moore noted "medical source conclusions about the claimant's limitations or restrictions which are significantly different" from his findings. Id. at 536.

> [Consultive Examination] [Medical Assessment] 12/09 Dr Woods limits claimant to no [occasional] [lifting] restrictions, but states that he can [frequently] lift 10lbs, stand/walk for less than 2 [hours], and sit [with] no restrictions. This appears overly restrictive considering claimant has mostly [normal] strength, [range of motion] and mobility. Buerger's disease appears to have remained fairly stable [with] treatment.

> Current [Consultive Examination] [Medical Assessment] Dr Rhinehart does not limit claimant. However, claimant does have longstanding [history] of Beurger[']s disease [with] significant vascular flow problems in both lower extremities. [Claimant] would likely experience difficulties [with] prolong[ed] standing/walking and exertional activities.

Id. at 536.

Dr. Moore concluded:

> Claimant['s] allegations of pain and other symptoms appear credible. The claimant has [history] of Buerger's disease that is causing vascular problems in lower extremit[ie]s. There is also evidence of high cholesterol, [diabetes], [hypertension]. It is reasonable that these impairments would cause pain and functional limitations. Claimant [with] longstanding [history] of Buegers disease dating back to age 18.

15

This results in decrease pulses and reduced flow in both lower extremities below the knees. This condition[] appears to have remained stable [with] treatment. Currently, [Consultive Examination] panelist was unable to find pulses in feet. However, there is no evidence of cyanosis or swelling at this time. Claimant had fairly [normal] strength, mobility and function [with] lower extremities. Claimant continues to smoke and has obesity which likely negatively impacts vascular function. There is no other evidence of EOD due to [hypertension], high chol[e]sterol or diabetes. No evidence of severe hearing impairment in file.

Claimant indicates difficulty standing/walking for longer periods. Reports difficulty [with] [activities of daily living] secondary to pain and symptoms. However, claimant states that he does help take care of his children, performs personal care, does laundry, dishes, garbage, and does some mowing. RFC reduced due to medical history, pain, and objective evidence. Claimant [appears] capable of sustaining RFC at 20/10/2/6 [occasional] posturals, never climb [ladders/ramps/stairs], [occasional] use of bilateral lower extremities push/pull. [Modified onset date] = [Date of filing].

Id. at 538.

After Plaintiff's request for reconsideration, on April 7, 2011, Jeffrey Bryant, Ph.D. conducted a case analysis. Id. at 546-47. Dr. Bryant stated that Plaintiff did not provide any new allegations on reconsideration and opined that "the initial assessment is still supported and is hereby affirmed as written." Id. at 546.

Dr. Carolyn Parrish also conducted a second case analysis and stated that Plaintiff did not allege any worsening "and the initial assessment dated 1/31/11 is affirmed as written[.]" Id. at 548-49.

On May 23, 2011, Plaintiff completed a disability report for his benefits appeal. Id. at 205-13. Plaintiff stated that his condition had worsened, and specified that "[he is] getting much weaker, more depressed and [his] Buegers disease is worse," "[a]ll is getting worse [and] panic attacks are more often" and "[his] diabetes is getting less controlled[.]" Id. at 206-07. At this time, Plaintiff reported taking several medications for diabetes, blood pressure, hyperglyceride, cholesterol,

"Burgers" and anxiety/panic attacks. Id. at 209. Plaintiff wrote that his conditions affected his ability to work because he has "severe pain in [his] legs [and] hips. [His] diabetes progressed and [he has] more anxiety and panic attacks." Id. at 210.

On August 21, 2012, ALJ Ronald Miller held another hearing to determine Plaintiff's eligibility for Social Security benefits. Id. at 36. On August 24, 2012, Plaintiff's attorney sent a letter to the ALJ stating that he had "obtained a copy of medical records from Mercy Hospital in Cedar Rapids, Iowa from February 1989" and that "[o]f particular note, was comments by the Radiologist in regard to the Long Term effect of Duegers (sic) Disease." Id. at 35. As a result, the ALJ sent a supplemental interrogatory to the vocational expert who testified at Plaintiff's hearing. Id. at 216-18. The ALJ restated his hypothetical from the hearing and the vocational expert's testimony and then stated:

Assume further the individual described in item #6 could also

- understand and remember simple and multi-step instructions,
- attend to such instructions for periods of at least two (2) hours in an eight-hour workday with appropriate break periods,
- be incapable of routine interactions with the general public while still exercising appropriate social interactions with supervisors and co-workers, and
- be capable of adapting to infrequent changes in the workplace.

Could such an individual perform all three of those [previously listed] occupations?

Id. at 216-17. The vocational expert checked the box for "yes." Id.

On November 7, 2012, the ALJ denied Plaintiff's application for Social Security benefits and determined that Plaintiff was not disabled. Id. at 16-34. Plaintiff requested review of the decision, and that request was denied. Id. at 1-15.

## B. Conclusions of Law

A "disability" is defined by the Social Security Act as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1); see also 42 U.S.C. § 1382c(a)(3). A reviewing court's evaluation of the Commissioner's decision is based upon the record made from the administrative hearing process. Jones v. Sec'y, Health and Human Servs., 945 F.2d 1365, 1369 (6th Cir. 1991). Judicial review is limited to determination of (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. Landsaw v. Sec'y of Health and Human Servs., 803 F.2d 211, 213 (6th Cir. 1986). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007) (quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)).

Plaintiff applied for Disability Insurance Benefits (DIB) and Social Security Insurance (SSI) on July 27, 2010. (Docket Entry No. 15, Administrative Record, at 137). Plaintiff's alleged onset date of disability is November 30, 1989. DIB are only available from the date of application through the last insured date. Plaintiff's last insured date was June 30, 1991. As such, to receive DIB, Plaintiff must demonstrate that he was disabled during the period from November 30, 1989 to June 30, 1991. Plaintiff has not provided any medical records from this time period.

Plaintiff contends that the ALJ[3] erred by: (1) failing to give appropriate weight to Plaintiff's subjective complaints; (2) finding that Plaintiff could perform some work; and (3) failing to accord appropriate weight to Plaintiff's medical reports.

Plaintiff asserts that the ALJ erred by failing to give appropriate weight to Plaintiff's subjective complaints. Plaintiff's argument is:

> At the Administrative Law Judge hearing, Mr. Junker testified as to the problems that he has with his back, legs, depression, and inability to sustain any activity for extended periods or to be around people who were unfamiliar with his condition.
>
> Once the Claimant establishes his inability to perform any of his past relevant work the burden of proof shifts to the Secretary to establish by substantial evidence, that the Claimant is capable, physically, emotionally, and through prior training or education, of performing substantial gainful employment consistent with his age, education, and past work experience.

(Docket Entry No. 25, Plaintiff's Brief, at 3) (internal citations omitted).

An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997) (citing Villarreal v. Sec'y of Health and Human Serv. 818 F.2d 461, 463 (6th Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. Id. If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting

---

[3] In his brief, the Plaintiff alleges errors made by "the Appeals Council." When the Appeals Council denies a claimant's appeal, the decision of the ALJ stands as the final decision of the Commissioner, and it is the ALJ's findings that are challenged upon judicial review. Sims v. Apfel, 530 U.S. 103, 107 (2000) ("But if, as here, the Council denies the request for review, the ALJ's opinion becomes the final decision."). As such, the Court will consider Plaintiff's assignment of errors as applying to the determination of the ALJ.

a claimant's testimony, and the reasons must be supported by the record. See Felisky v. Bowen, 35 F.3d 1027, 1036 (6th Cir. 1994); King v. Heckler, 742 F.2d 968, 975 (6th Cir. 1984).

Plaintiff does not specify the bases of the ALJ's alleged erroneous findings of medically determinable impairments nor in the ALJ's finding of those impairments' severity. In determining the severity of Plaintiff's impairments, the ALJ reviewed Plaintiff's testimony and stated that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Docket Entry No. 15 at 26). The ALJ relied on Plaintiff's sparse treatment record, positive physical and mental health reports, noncompliance with prescribed treatment, and performance of activities of daily living to determine that Plaintiff's allegations were not consistent with his impairments. These are valid considerations for an ALJ to determine Plaintiff's credibility.

Further, the administrative record supports each of the ALJ's findings. Plaintiff has submitted an extremely sparse treatment record. Plaintiff's alleged onset date of disability for DIB is November 30, 1989 and his insured status expired on June 30, 1991. Plaintiff has not submitted any medical records within this period. See Moon v. Sullivan, 923 F.2d 1175, 1182 (6th Cir. 1990) ("In order to establish entitlement to disability insurance benefits, an individual must establish that he became 'disabled' prior to the expiration of his insured status.").

Plaintiff applied for SSI on July 26, 2010 and the ALJ's decision issued on November 7, 2012. Plaintiff has submitted four medical records dated within this period, and three of these were consultative examinations for the purpose of Plaintiff's application for social security benefits. See

Brooks v. Sullivan, 941 F.2d 1209, 1991 WL 158744 at *2 (6th Cir. 1991) ("To establish medical eligibility for SSI, plaintiff must show either that he was disabled when he applied for benefits in June 1987, or that he became disabled prior to the Secretary's issuing of the final decision on this claim on March 3, 1989."). Plaintiff's only medical record was a bilateral ankle-brachial measurement performed on December 16, 2010. (Docket Entry No. 15 at 527). This test found "[m]ild to moderate bilateral lower extremity arterial insufficiency based on ankle-brachial indices alone." Id. Moreover, Plaintiff's failure to seek treatment during the relevant period is an appropriate consideration in determining credibility. Fort v. Comm'r of Soc. Sec., 2010 WL 3789622 at *6 (E.D. Mich. July 28, 2010) ("A review of the record indicates that Plaintiff saw a counselor, Mr. Haefner, approximately 14 times during an eight-month period from October 2007 through May 2008. During this period, psychiatrist Dr. Sadasivan examined Plaintiff only once, in November 2007. These sparse treatment records simply do not establish that – as of Plaintiff's alleged onset of disability, in January 2006 – Plaintiff experienced mental impairments that significantly interfered with his ability to work.").

Plaintiff also reported that he could perform activities of daily living. On October 4, 2010, Plaintiff stated in a function report that he could do "laundry, dishes, take out garbage, mow (rider)[,] mow (pushmower)[.]" (Docket Entry No. 15 at 188). On November 9, 2010, Plaintiff told consultative examiner Dr. Hughes that he could prepare simple meals, wash dishes, vacuum, sweep, do laundry, read, watch movies, and fish. Id. at 503. On January 31, 2011, Dr. James Moore conducted a physical RFC and stated that "[Plaintiff] [r]eports difficulty [with] [activities of daily living] secondary to pain and symptoms. However, claimant states that he does help take care of his children, performs personal care, does laundry, dishes, garbage, and does some mowing." Id. at 538.

The ability to complete activities of daily living is a relevant factor in determining credibility. See Rowland-Monk v. Comm'r of Soc. Sec., 2015 WL 104897 at *7 (S.D. Ohio Jan. 7, 2015) ("Plaintiff further asserts the ALJ erred in relying on her reported activities of daily living, *i.e.*, occasionally driving and doing chores, in discounting her credibility and finding her not disabled. The undersigned finds that the ALJ's credibility determination is supported by substantial evidence.").

Finally, the ALJ considered that Plaintiff was noncompliant with recommended treatment. Plaintiff was diagnosed with Buerger's disease, "a rare disease of the arteries and veins in the arms and legs."[4] Plaintiff reported that Buerger's disease affected his ability to sit and stand, and resulted in fear of handling heavy objects because he worried the object would fall on his foot and require amputation. Buerger's disease, however, is related to using tobacco products. "Quitting all forms of tobacco is the only way to stop Buerger's disease." Plaintiff was counseled to stop smoking. (Docket Entry No. 15 at 381, 232, 371). Yet, Plaintiff continued to smoke up to a pack of cigarettes per day. Id. at 260, 426, 494, 501 and 538. At the hearing, Plaintiff reported smoking three-quarters of a pack of cigarettes per day. Id. at 43. Plaintiff's noncompliance with recommended treatment is a relevant consideration in determining credibility. See Yonts, Jr. v. Astrue, 2010 WL 3294403 at *5 (E.D. Ky. Aug. 20, 2010) ("Despite advice from Dr. Gooch to quit smoking, the claimant continued to smoke cigarettes. Thus, the medical evidence does not appear sufficient to confirm the severity of the alleged pain and objective medical evidence would not appear to be consistent with the plaintiff's claims of disabling pain."); Hill v. Comm'r of Soc. Sec., 2012 WL 5845352 at *13

---

[4]This summary is provided by the Mayo Clinic, and can be accessed at:
http://www.mayoclinic.org/diseases-conditions/buergers-disease/home/ovc-20179160

(N.D. Ohio Nov. 19, 2012) ("Fifth, Plaintiff was advised to quit smoking and elevate her feet to alleviate the symptoms of pain. Both recommendations were considered helpful to alleviating pain and other symptoms and improving her prognosis. Plaintiff claimed that she quit smoking several months prior to the hearing; otherwise, there is no evidence that she complied with the treatment advice of her physician. ... The Magistrate is persuaded that the ALJ's credibility decision should not be disturbed."). The Court concludes that the ALJ did not err in his determination of Plaintiff's credibility.

Next, Plaintiff asserts that the ALJ erred by accepting the vocational expert's testimony. Plaintiff states that "the vocational expert testified that as a result of the Claimant['s] medical limitations that there were no jobs which he could perform in the national economy." (Docket Entry No. 25 at 4). Plaintiff cites the ALJ's final question to the vocational expert:

> Q All right. Now, let me ask you to assume for hypothetical number two a candidate for employment that who would need to elevate the legs on a regular basis above the heart during the eight hour work day, and would be unable to leave the house for more than a few hours during the day due to the anxiety disorder. What about these jobs that you described for us? Would they be available?
>
> A No, your honor. Either of those elements would preclude the numbers that I cited as well as any other sedentary work.

(Docket Entry No. 15 at 61).

The restrictions described in the ALJ's question were not part of Plaintiff's RFC. After the hearing, the ALJ sent an interrogatory to the vocational expert providing a new hypothetical. Id. at 216-18. The ALJ's letter stated:

> At the hearing on August 21, 2012, I asked you to assume a hypothetical individual who was born on November 22, 1968, has a limited education with the ability to communicate in English as defined in 20 CFR 404.1564 and 416.964, and no relevant work experience. I also asked you to assume this individual could lift and

23

carry ten (sic) a maximum of ten (10) pounds, stand and walk for less than two (2) hours, and sit without restriction in an eight-hour workday. You responded such an individual could perform sedentary and unskilled work that included hand material movers (1,400 jobs in the state of Tennessee and 47,000 in the nation), inspectors and sorters (1,100 and 62,000), and miscellaneous assembly workers (1,000 and 37,000).

Assume further the individual described in item #6 could also
• understand and remember simple and multi-step instructions,
• attend to such instructions for periods of at least two (2) hours in an eight-hour workday with appropriate break periods,
• be incapable of routine interactions with the general public while still exercising appropriate social interactions with supervisors and co-workers, and
• be capable of adapting to infrequent changes in the workplace.

Could such an individual perform all three of those occupations?

Id. at 216-17. The vocational expert checked the answer box "yes," and did not include any further information. Id. at 217.

In his decision, the ALJ wrote that "the vocational expert's response to the vocational interrogator[y] was proffered to the claimant and his representative, but no response or other comment was received from the claimant or his representative. Id. at 29. Plaintiff asserts that he did respond, and in fact a response is included in the record. Id. at 14-15. In his response, Plaintiff's attorney did not question the vocational expert's conclusions.

Thank you for allowing me to review the Interrogatories which you submitted to Dr. Gary Sturgill subsequent to the hearing of Mr. Junker.

I would respectfully request that I be allowed to submit a follow up series of interrogatories to Dr. Sturgill. Enclosed you will find those interrogatories.

Id. at 14.

Plaintiff did not object to the vocational expert's conclusions. Plaintiff does not now specify the error he alleges. Plaintiff states that "the Administration (sic) Law Judge had an absolute duty

24

to provide [a] fair and complete hearing and to develop a record which would include proof as to the Claimant[']s ability to do sedentary work, with jobs specifically named which the Administrative Law Judge felt were available to the Claimant." (Docket Entry No. 25 at 4-5). Yet, in his decision, the ALJ found:

> The vocational expert stated that given all of these factors the individual would be able to perform the requirements of representative occupations such as hand material movers (sedentary, unskilled) with 47,000 jobs in the United States and 1,400 jobs in Tennessee; inspectors and sorters (sedentary, unskilled) with 62,000 jobs in the United States and 1,100 jobs in Tennessee; and miscellaneous assembly workers (sedentary, unskilled) with 37,000 jobs in the United States and 1,000 jobs in Tennessee.

(Docket Entry No. 15 at 29).

The Court concludes that the ALJ did not err in relying on the vocational expert's testimony and in deciding, consistent with that testimony, that Plaintiff could perform the listed jobs.

Finally, Plaintiff asserts that the ALJ erred by failing to give appropriate weight to the opinion of Plaintiff's treating physician. Plaintiff cites a record from Dr. Robert Brimmer dated February 13, 1989 and implies that Dr. Brimmer is Plaintiff's treating physician. There is no other medical record from Dr. Brimmer among Plaintiff's medical records. Further, the date of the record predates Plaintiff's alleged onset date of disability. Finally, Dr. Brimmer's record does not assign Plaintiff any physical limitation, but does state that Dr. Brimmer "strongly encouraged [Plaintiff] on multiple occasions to stop smoking." Id. at 383. Plaintiff has not identified a treating physician to whom more significant weight should be given. The Court concludes that the ALJ did not err by considering the opinion of consultative examiners.

Plaintiff also asserts a lack of "substantial evidence" and repeats his assertion that the ALJ erred in considering the vocational expert's testimony. For the reasons stated above, the Court

concludes that substantial evidence supports the ALJ's determination that Plaintiff was not disabled

for the time periods at issue. The Court concludes that the ALJ's decision should be affirmed

and that Plaintiff's motion for judgment on the record (Docket Entry No. 25) should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the _17th_ day of February, 2016.

WILLIAM J. HAYNES, JR.
Senior United States District Judge